IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BRITT HAWKER,<br><br>                Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, *in her capacity as Acting Commissioner of the Social Security Administration*,<br><br>                Defendant. | **REPORT AND RECOMMENDATION**<br><br>Case No.  2:13-cv-383-TS-EJF<br><br>Chief Judge Ted Stewart<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Britt Hawker filed this action asking this Court to reverse or remand the final agency decision denying her Disability Insurance Benefits ("DIB") and Social Security Income ("SSI") under Titles II and XVI of the Social Security Act, *see* 42 U.S.C. §§ 401–434, 1381–1383f.  The Administrative Law Judge ("ALJ") determined that Ms. Hawker did not qualify as disabled within the meaning of the Social Security Act.  (Admin. R. Doc. 23, certified copy tr. of R. of admin. proceedings:  Britt Hawker (hereinafter "Tr. __").)  Based on the Court's careful consideration of the record, the parties' memoranda, and relevant legal authorities, the undersigned RECOMMENDS[1] the Court REMAND the Commissioner's decision[2] for further proceedings consistent with this Recommendation, primarily reconsidering the jobs available to Ms. Hawker in the national economy, weighing Dr. MacDonald's opinion, and ordering a psychological evaluation.

---

[1] On October 7, 2013, Chief Judge Ted Stewart referred this case to the undersigned Magistrate Judge under 28 U.S.C. § 636(b)(1)(B).  (ECF No. 16.)

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

## I. FACTUAL & PROCEDURAL HISTORY

Ms. Hawker filed for SSI and DIB on January 6, 2010, alleging a disability onset date of February 26, 2007. (Tr. 23.) The Regional Commissioner denied Ms. Hawker's claims on September 8, 2010, and again upon reconsideration on January 3, 2011. (*Id.*) At Ms. Hawker's request, a hearing before an ALJ took place on January 23, 2012, during which she modified her alleged onset date to January 1, 2009. (*Id.*) On February 24, 2012, the ALJ issued a decision denying Ms. Hawker's claims. (Tr. 20–36.)

### A. Medical History

Ms. Hawker, born in July 1964, (tr. 145), filed for DIB and SSI on the bases of neck pain, headaches, sleep apnea, lower back problems, and depression, (tr. 184).

Ms. Hawker underwent an MRI in March 2007, and in December of that year Dr. Bradley Duhon, a neurosurgery resident, diagnosed her with "degenerative disk disease . . . at C5-6 and C6-7, mild bilateral foraminal stenosis at C5-6, moderate right-sided C6-7 foraminal stenosis, and moderate to severe left-sided foraminal stenosis at C6-7." (Tr. 304.)

In January 2008, Ms. Hawker underwent "left C5-6 and C6-7 foraminotomies" to relieve her foraminal stenosis. (Tr. 297.) Ms. Hawker saw Dr. Duhon for a postoperative visit in February 2008. (Tr. 295–96.) Although Ms. Hawker did not subjectively feel her condition had improved markedly, Dr. Duhon noted she had "good range of motion in all directions of her neck" and "minor weakness" in her left arm. (Tr. 295.)

A November 2008 electromyography (EMG) test of Ms. Hawker's upper extremities showed mild radiculopathy at C6-C7 on both the right and left, mild right median mononeuropathy at the wrist, and right moderate to severe lateral epicondylitis. (Tr. 309.) Dr. Michael Giovanniello, a pain specialist who performed the EMG evaluation, recommended

steroid injections and, if symptoms did not abate with the injections, possible surgical

consultation.  (*Id.*)

Ms. Hawker underwent another MRI in December 2008.  (Tr. 435–36.)  The radiologist,

Dr. John Henrie, found "broad based posterior disk bulge/protrusion" at C5-6 "causing mild

narrowing of the left foramen and mild to moderate foraminal entrance stenosis on the right" and

"broad based posterior disk bulge asymmetric left posterolateral component abutting but not

overtly effacing the left ventral cord . . . . [and] asymmetric left side uncovertebral spurring

contributing to mild narrowing of the foraminal entrance."  (Tr. 435-36.)  Dr. Henrie noted

postoperative changes in that region.  (Tr. 436.)

Ms. Hawker's amended alleged onset date places the beginning of her current alleged

disability at January 1, 2009, but she does not identify a specific incident or change tied to that

date.  (*See* tr. 254.)

In May 2009, Dr. Kevin Tschetter—Ms. Hawker's primary care physician—completed a

residual functional capacity questionnaire.  (Tr. 358–60.)  Dr. Tschetter described Ms. Hawker's

symptoms as including neck pain, shoulder pain in both arms, weakness in both hands, and

headaches.  (Tr. 358.)  Dr. Tschetter opined Ms. Hawker could sit for only fifteen minutes at a

time for a total of one hour in an eight-hour workday and stand or walk for twenty minutes at a

time for a total of one hour in an eight-hour workday.  (*Id.*)  He also opined Ms. Hawker would

require unscheduled thirty-minute breaks every fifteen minutes and that she would require the

ability to shift positions from sitting to standing or walking at will.  (*Id.*)  He also stated Ms.

Hawker could never use her hands for grasping, turning, or twisting objects or for fine

manipulation and that she could only use her arms to reach twenty-five percent of the time

during an eight-hour workday.  (*Id.*)  Dr. Tschetter also indicated Ms. Hawker would require more than four absences from work per month.  (*Id.*)

Dr. Jozef Ottowicz, with Bountiful Neurology, P.C., completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) at the request of the state agency in August 2009.  (Tr. 372–77.)  Dr. Ottowicz opined that Ms. Hawker could sit for eight hours, stand for two hours, and walk for four hours total in an eight-hour work day.  (Tr. 373.)  He also opined Ms. Hawker could frequently reach and continuously handle, finger, feel, and push or pull with both hands and arms.  (Tr. 374.)  Pursuant to his examination of Ms. Hawker, Dr. Ottowicz noted inconsistencies during strength testing of her arms and shoulders and in her subjective complaints as compared to the objective findings of the neurological examination he performed.  (Tr. 369.)

In February 2010, Dr. Berkely Hanson, a radiologist, performed another MRI on Ms. Hawker.  (Tr. 432–33.)  Dr. Hanson found some degenerative changes and "mild narrowing of the left neural foramen, mild to moderate narrowing of the right neural foramen, and mild narrowing of the central canal" at C5-6, "moderate narrowing of the left neural foramen, mild narrowing of the right neural foramen, and mild to moderate narrowing of the central canal" at C6-7, and "[s]ignificant neural foraminal or central canal stenosis" at C7-T1.  (Tr. 433.)

Also in March 2010, Dr. Joel MacDonald provided Ms. Hawker with a neurosurgical consultation because of her complaints of neck and upper extremity pain.  (Tr. 530–34.)  Dr. MacDonald reviewed Ms. Hawker's February 2010 MRI and diagnosed "[c]ervical spondylosis with upper extremity radiculopathy."  (Tr. 533.)  Dr. MacDonald discussed both conservative and invasive treatment options with Ms. Hawker.  (*Id.*)

In March 2010, Ms. Hawker visited Valley Mental Health complaining of depression and anxiety. (Tr. 467–74.) Dean Kennington, LCSW, diagnosed Ms. Hawker with major depressive disorder, posttraumatic stress disorder, and personality disorder. (Tr. 467.) Ms. Hawker received some counseling through Valley Mental Health but discontinued counseling after only a few visits. (*See* tr. 472–74.)

Dr. Joseph Fyans, M.D., examined Ms. Hawker in December 2010 at the request of the state agency. (Tr. 517—22.) Dr. Fyans noted Ms. Hawker claimed disability on the basis of neck and shoulder pain. (Tr. 522.) Dr. Fyans' notes indicate "mild limitation with flexion and more noticeable limitation with extension and axial rotation" of Ms. Hawker's neck and that she had generally normal strength in her upper limbs. (*Id.*) Dr. Fyans noted Ms. Hawker's clear, legible handwriting and that she accurately checked several small boxes on some paperwork. (*Id.*) Dr. Fyans concluded Ms. Hawker "would have difficulty doing any heavy lifting with the right upper limb. . . . [and] with carrying heavy weight or doing heavy lifting from the waist up" as a result of her neck pain. (*Id.*) Thus, he limited Ms. Hawker's overhead activities to "occasionally." (*Id.*) Dr. Fyans also noted some tenderness in Ms. Hawker's shoulders and opined that "[s]he would likely have difficult[y] doing overhead activities more than occasionally." (*Id.*) He concluded that her shoulder difficulties would also prevent her from doing heavy lifting from the waist up. (*Id.*)

### B. Work History

Ms. Hawker has work experience as a certified nursing assistant (CNA) in nursing homes, in assisted living homes, in rehabilitative nursing, and most recently in private nursing. (Tr. 221.) Ms. Hawker's most recent position, as a private nurse, required her to lift groceries, boxes, supplies, and a person with a disability who weighed one hundred and seventy-five

pounds.  (Tr. 222.)  Ms. Hawker's previous nursing duties included similar tasks, such as

facilitating showers and activities of daily living, handling doctor calls, transferring patients,

lifting and repositioning patients (e.g., from bed to chair and chair to shower).  (Tr. 223–28.)  At

the hearing Ms. Hawker testified that she re-injured her back in February 2007 when lifting a

patient.  (Tr. 62.)

## II. STANDARD OF REVIEW

42 U.S.C. §§ 405(g) and 1383(c)(3) provide for judicial review of a final decision of the

Commissioner of the Social Security Administration ("SSA").  The Court reviews the

Commissioner's decision to determine whether the record as a whole contains substantial

evidence in support of the Commissioner's factual findings and whether the SSA applied the

correct legal standards.  42 U.S.C. §405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

The Commissioner's findings shall stand if supported by substantial evidence.  42 U.S.C. §§

405(g), 1383(c)(3).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion

constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly

contradicted by other evidence."  *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).[3]  The

standard "requires more than a scintilla, but less than a preponderance."  *Lax*, 489 F.3d at 1084.

"Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of

evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but

mere conclusion."  *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotation

marks and citations omitted).  Moreover, "[a] finding of 'no substantial evidence' will be found

---

[3] Courts apply the same analysis in determining disability under Title II and Title XVI.
*See House v. Astrue*, 500 F.3d 741, 742 n.2 (8th Cir. 2007).

only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's," *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted), but "review only the *sufficiency* of the evidence," *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). The court does not have to accept the Commissioner's findings mechanically, but "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## III. ANALYSIS

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Williams v. Bowen*, 844 F.2d 748, 750–53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520, 416.920.  The claimant has the initial burden of establishing the disability in the first four steps.  *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).  At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy.  *Id.*

The ALJ evaluated Ms. Hawker's claim through step five, making the following findings of fact and conclusions of law with respect to Ms. Hawker:

1.    "[Ms. Hawker] meets the insured status requirements of the Social Security Act through December 31, 2012." (Tr. 25.)

2.    "[Ms. Hawker] has not engaged in substantial gainful activity since February 26, 2007, the alleged onset date, nor since January 1, 2009 the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)" (*Id.*)

3.    "[Ms. Hawker] has the following severe impairments: back disorders (discogenic and degenerative); affective/mood disorders; and obesity (20 CFR 404.1520(c) and 416.920(c))." (*Id.*)

4.    "[Ms. Hawker] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (Tr. 26.)

5.    "[Ms. Hawker] has had at least the residual functional capacity to perform the full range of sedentary unskilled work, except that such work could not require:

- Lifting more than 8.5 pounds at a time, on more than a 'less than occasional' basis;
- Lifting or carrying lighter articles weighing more than 3-5 pounds, on more than an 'occasional' basis (which means from very little up to one-third of the day);
- Standing or walking more than 6 hours total in an 8-hour workday;
- Sitting more than 6 hours total in an 8-hour workday;
- Note:   regarding standing, walking and sitting, to be as comfortable as possible, [Ms. Hawker] requires the option to make postural changes every 10-15 minutes (the sit/stand option), thus there must be an option to perform work duties while standing/walking or sitting;
- Bending, twisting or squatting on more than a 'less than occasional' basis;
- Stooping on more than an 'occasional' basis;
- Work on the floor (e.g. kneeling, crawling, or crouching) on more than a 'less than occasional' basis;
- Climbing flight(s) of stairs (a few steps up or down not precluded);
- Overhead lifting or overhead reaching on more than a 'less than occasional' basis;

- More than: occasional reaching, occasional handling, occasional fingering but no feeling duties;
- Work at more than a low stress level, which means: 1) a low production level (where VE classified SGA jobs as low, average, or high production) and 2) working with the general public only occasionally;
- Work at more than a low concentration level, which means the ability to be alert and attentive to (and to adequately perform) only unskilled work tasks; and,
- Work at more than a low memory level, which means: 1) the ability to understand, remember and carry out only 'simple' work instructions (where 'simple' means functioning at GED levels of only – Reasoning: 3, Math: 2, and Language: 2); and 2) the ability to remember and deal with only minimal changes in the work instructions from week to week; and 3) the ability to remember and use appropriate judgment in making only simple work-related decisions." (Tr. 27–28.)

6.  "[Ms. Hawker] is unable to perform any past relevant work (20 CFR 404.1565 and 419.965)." (Tr. 34.)

7.  "[Ms. Hawker] was born on July 15, 1964 and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963)." (*Id.*)

8.  "[Ms. Hawker] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964)." (*Id.*)

9.  "Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of 'not disabled,' whether or not [Ms. Hawker] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)." (*Id.*)

10. "Considering [Ms. Hawker]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Ms. Hawker] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))." (*Id.*)

11. "[Ms. Hawker] has not been under a disability, as defined in the Social Security Act, from February 26, 2007, nor from the amended alleged onset date of January 1, 2009 through the date of this decision (20 CFR 404.1520(g) and 416.920(g))." (Tr. 35.)

In short, the ALJ concluded Ms. Hawker did not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, and that she had the residual functional capacity to perform other

work that exists in significant numbers in the national economy, and thus that she had not had a disability since the amended alleged onset date of January 1, 2009. (Tr. 23–36.)

In support of her claim that this Court should reverse the Commissioner's decision, Ms. Hawker raises many points of error, including that the ALJ failed to evaluate the physician opinion evidence properly, that the vocational expert's testimony conflicted with the DOT, and that the ALJ should have ordered a psychological exam. Because of these alleged errors, Ms. Hawker argues the Court should remand her case. The undersigned RECOMMENDS remand.

### A. Consideration of Impairments

Ms. Hawker argues the ALJ erred when he failed to mention Ms. Hawker's shoulder impairment, moderate-to-severe right epicondylitis, continued radiculopathy, posttraumatic stress disorder ("PTSD"), and personality disorder and did not find these conditions qualified as severe impairments in combination with Ms. Hawker's other severe impairments. (Pl.'s Opening Br. 9, ECF No. 17.) The Court disagrees.

Step two of the sequential evaluation process requires the ALJ to decide whether the claimant has a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment or combination of impairments qualifies as severe when it significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). If the ALJ finds no severe impairments at step two, the inquiry ends, and the ALJ finds the claimant not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). However, if the ALJ finds *any* impairment severe, the inquiry continues. 20 C.F.R. § 404.1520(a). Subsequently, in determining the RFC, the ALJ considers all medically determinable impairments, including non-severe impairments. 20 C.F.R. § 404.1545(a)(2). Because the ALJ considers both severe and non-severe impairments at later steps, any failure to designate additional severe impairments at step two qualifies as harmless if

-11-

the ALJ finds at least one severe impairment and continues with the sequential evaluation process. *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *Brescia v. Astrue*, 287 F. App'x 626, 629 (10th Cir. 2008).

Here, the ALJ found at step two that Ms. Hawker had severe impairments consisting of "back disorders (discogenic and degenerative); affective/mood disorders; and obesity." (Tr. 25.) Having found that Ms. Hawker possessed these severe impairments, the ALJ continued with the sequential evaluation process. (Tr. 26-36.) Thus, no error occurred at step two.

In determining Ms. Hawker's RFC, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p" in addition to "opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. 28.) Specifically, the ALJ considered the shoulder impairments, moderate-to-severe right epicondylitis, continued radiculopathy, PTSD, and personality disorder. (Tr. 28-30.) For example, the ALJ noted Ms. Hawker's testimony about the pain in her neck, mid back, shoulders, fingers, and arms when determining Ms. Hawker's RFC. (Tr. 28.) The ALJ also noted Ms. Hawker's radiculopathy and epicondylitis. (Tr. 29.) The ALJ's RFC analysis included substantial discussion of Ms. Hawker's shoulder impairments. (Tr. 29–30.) Although the RFC analysis does not specifically mention "personality disorder," the ALJ does discuss Ms. Hawker's mental impairments and specifically notes Ms. Hawker's PTSD and major depressive disorder. (Tr. 30.) In discussing Ms. Hawker's PTSD and major depressive disorder the ALJ cites to the same record pages Ms. Hawker cites regarding her personality disorder. (*See* tr. 30,

467.)  Because the ALJ found severe impairments at step two and continued the sequential

evaluation process, any error at step two remains harmless.

To the extent Ms. Hawker argues a failure to consider these impairments at the steps

subsequent to step two, she also errs.  In determining whether a claimant's impairments make the

claimant disabled, "the Secretary must consider the combined effects of impairments that may

not be severe individually, but which in combination may constitute a severe medical disability."

*Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir. 1991) (citation omitted); *see also* 20 C.F.R.

§§ 404.1523, 416.923.  Likewise, when determining a "claimant's RFC, the ALJ must consider

the combined effect of all of the claimant's medically determinable impairments, *whether severe*

*or not severe.*"  *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (citing 20 C.F.R. §§

404.1545(a)(2), 416.945(a)(2)).  "The failure to consider all of the claimant's impairments in

combination is error."  *Sand v. Shalala,* 820 F. Supp. 1299, 1309 (D. Kan. 1993).  Given the

ALJ's discussion of these impairments and citations to the record, the undersigned finds nothing

to suggest the ALJ failed to consider Ms. Hawker's impairments.  Therefore, the undersigned

RECOMMENDS denying the request to remand on this point.

## B. Consistency of Findings

Ms. Hawker argues that because the ALJ found her affective/mood disorders constitute a

severe impairment, (tr. 25), the ALJ erred by making the following findings in the functional

areas:  no restrictions of activities of daily living; mild difficulties in maintaining social

functioning; mild difficulties in concentration, persistence, or pace; and no episodes of

decompensation when analyzing the Paragraph B criteria.  (Opening Br. 10, ECF No. 17.)  Ms.

Hawker cites the following from the regulations:

> If we rate the degree of your limitation in the first three functional areas as 'none'
> or 'mild' and 'none' in the fourth area, we will *generally* conclude that your

> impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.

20 C.F.R. § 404.1520a(d)(1) (emphasis added).  The regulation clearly recognizes that this conclusion does not apply to all cases, and Ms. Hawker provides no substantive analysis to demonstrate that the ALJ erred in finding her affective/mood disorder a severe impairment or in not finding greater restrictions in the four functional areas.  "The court is not required to consider poorly developed arguments."  *Cross v. Colvin*, No. 12-cv-01722-WYD, 2013 WL 5402056, at *2 (D. Colo. Sept. 26, 2013) (citing *Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1161 (10th Cir. 2012)); *see also Anderson v. Colvin*, No. 12-cv-01282-REB, 2013 WL 3216140, at *3 n.3 (D. Colo. June 25, 2013) (declining to consider inadequately briefed and undeveloped arguments).  Furthermore, the ALJ goes into detail about the limitations Ms. Hawker does have as a result of her affective/mood disorder.  (Tr. 26, 30.)  The ALJ's opinion provides sufficient specificity to allow the Court to review his RFC decision and subsequent decisions.  That specificity proves more useful in understanding the basis for the ALJ's decision than does the label "severe" at step two or the mere use of the words none, mild, moderate, marked, or extreme for the functional areas.  For these reasons, the undersigned RECOMMENDS the Court find no error as to this point.

## C. RFC Analysis

Ms. Hawker asserts four errors in the ALJ's analysis of her RFC.  (*See* Opening Br. 10–13, ECF No. 17.)

### 1. *"At least"*

Ms. Hawker argues the ALJ erred by finding that Ms. Hawker "had 'at least' the residual functional capacity to perform a range of sedentary, unskilled work."  (Opening Br. 11, ECF No. 17.)  Although SSR 96-8p explains that the RFC represents the most an individual can do, basing

the RFC on the least a claimant can do would only benefit Ms. Hawker.  *See* SSR 96-8p, 1996

WL 374814 at *4 (July 2, 1996) (noting that where ALJ finds RFC in terms of lowest exertional

level "(e.g., 'sedentary' or 'light' when the individual can perform 'medium' work)," the ALJ

"concede[s] lesser functional abilities than the individual actually possesses").  In finding that

Ms. Hawker had the residual functional capacity to perform "at least" a range of sedentary

unskilled work, (*see* tr. 27–28), the ALJ gave Ms. Hawker the benefit of the doubt.  The ALJ

posed hypotheticals to the vocational expert based on the possible findings regarding Ms.

Hawker's RFC and relied on the expert's testimony to find jobs exist in significant numbers in

the national economy that Ms. Hawker could perform.  (Tr. 69–74, 76-77.)  "[Ms. Hawker]

cannot show that a less stringent residual functional capacity finding would have led to a more

favorable result."  *See Pacheco v. Colvin*, No. 2:13-cv-197 DN, 2014 WL 869294, at *7 (D. Utah

Mar. 5, 2014).  For these reasons, the undersigned does not RECOMMEND remand on this

point.

### 2. *"Occasional"*

Ms. Hawker next argues the ALJ failed to ask the vocational expert sufficiently accurate

and detailed questions in that the ALJ never clarified the meaning of "less than occasional basis."

(Opening Br. 11, ECF No. 17.)  The ALJ defined "occasional" as "from very little up to one-

third of the day."  (Tr. 27); *see also* SSR 83-10, 1983 WL 31251, at *5 (1983) ("'Occasionally'

means occurring from very little up to one-third of the time.").  Despite Ms. Hawker's argument

to the contrary, the ALJ's meaning of "less than occasional" appears clear enough:  less than

very little and possibly never.  *See Lauer v. Apfel,* 169 F. 3d 489, 492-93 (7th Cir. 1999) (noting

this potential range but finding no error); *Udager v. Astrue,* 593 F. Supp. 2d 1082, 1087 (D.S.D.

2009) (noting claimant could not stoop and thus fell into the "less than occasional" category

requiring vocational expert testimony).  Ms. Hawker's counsel did not object to the ALJ's use of "less than occasional" at the hearing, and the Vocational Expert displayed no confusion on the meaning of that phrase.  (*See* tr. 69–77.)  The SSA's policy interpretations also use the limiting phrase "less than occasional."  *See* SSR 96-9p, 1996 WL 374185, at *8 (July 2, 1996).  For these reasons, the undersigned RECOMMENDS the Court find no error on this basis.

### 3. Conflict with State Agency Findings

Ms. Hawker argues the ALJ's limit on "work on the floor (kneel, crawl, or crouch)" to a "less than occasional basis," contradicts the DDS's finding that she could not crawl and only occasionally kneel and crouch.  (Opening Br. 11, ECF No. 17.)

"Administrative law judges are not bound by any findings made by State agency medical or psychological consultants."  20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).  Instead, ALJs consider such state agency findings as opinion evidence.  *Id.*  In evaluating these findings, ALJs must apply the relevant factors set forth in 20 C.F.R. §§ 404.1527 and 416.927.  *See* 20 C.F.R. §§ 404.1527(a)–(d), 416.927(a)–(d).  These factors include, for example, "the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).  An ALJ need not discuss each factor in deciding how to weigh an agency consultant's opinion.  *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("That the ALJ did not explicitly discuss all the § 404.1527([c]) factors for each of the medical opinions before him does not prevent this court from according his decision meaningful review.  Ms. Oldham cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."); SSR 06-03P, 2006 WL 2329939, at

*5 (August 9, 2006) (recognizing "[n]ot every factor for weighing opinion evidence will apply in every case").

Here, the ALJ explicitly evaluated the state agency physicians' opinions. (Tr. 33.) The ALJ concluded that as non-treating physicians, the state agency physicians' opinions did not command controlling weight. (*Id.*) The ALJ did, however, find that the state agency physicians "are experienced and knowledgeable regarding SSA disability requirements"; that their opinions "are well supported by the medical record"; and that their opinions "were consistent with the medical evidence that they reviewed at the time." (*Id.*) The ALJ therefore gave the opinions great weight. (*Id.*) In giving the opinions great, but not controlling, weight the ALJ can find that the other evidence provided leads to the conclusion that Ms. Hawker can kneel, crawl, or crouch on a less than occasional basis. Substantial evidence in the record, as described by the ALJ, supports this finding. Because the ALJ properly evaluated the state agency physicians' opinions, *see* 20 C.F.R. §§ 404.1527(a)–(d), 416.927(a)–(d), and because the state agency physicians' findings do not bind the ALJ, *see* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i), the undersigned RECCOMENDS the Court find no error.

### 4. *"Simple Work Instructions"*

Ms. Hawker objects to the ALJ's defining "simple" in the RFC as "functioning at GED levels of only – Reasoning: 3, Math: 2, and Language: 2," (tr. 28). (Opening Br. 11-12, ECF No. 17.) Ms. Hawker argues "a level 3 reasoning is incompatible with a limitation to 'simple and routine tasks.'" (Opening Br. 11, ECF No. 17.) Notably, the ALJ does not find Ms. Hawker limited to simple and routine tasks. (*See* tr. 28.) Rather the ALJ specifically defines what he means by "simple" in the context of work instructions with reference to particular GED levels.

The Tenth Circuit addressed whether a person limited to completing "simple and routine work tasks" can perform jobs requiring a reasoning level of three in *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005).  The Tenth Circuit held in *Hackett* that a person limited to completing simple and routine work tasks cannot perform jobs requiring level-three reasoning but can perform jobs requiring level-two reasoning.  *Id.* at 1176.

*Hackett* does not address Ms. Hawker's situation—where the ALJ explicitly states at what GED levels Ms. Hawker can perform, notably Reasoning: 3, Math: 2, and Language: 2. (Tr. 28.)  Where the ALJ specifies the claimant's capability, the court need not and should not substitute its judgment about what the ALJ meant.  Substantial evidence supports the ALJ's finding that Ms. Hawker can perform at the stated GED levels.  Thus the undersigned RECOMENNDS the Court find the ALJ did not err in defining his terms with specific reference to GED level.

### D. Function-by-Function Assessment

"The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in" the four functional areas.  SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996).  "Work-related mental activities generally required by competitive, remunerative work include the abilities to:  understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  *Id.* at *6.  "Therefore, an ALJ should not state a mental RFC in terms of the four functional areas, but should make a function-by-function assessment of each of the work-related mental activities relevant to the case at hand."  *Catlin v. Colvin*, No. 12-1474-JWL, 2014 WL 2922403, at *3 (D. Kan. June 27, 2014);

*see also Sawyer v. Astrue*, No. 08-2114-KHV, 2009 WL 634666, at *5 (D. Kan. Mar. 11, 2009) (finding ALJ "should make a function-by-function assessment of each of the work-related mental activities relevant to the case at hand").

Ms. Walker argues the ALJ erred by failing to include a particular area of function in the function-by-function analysis SSR 96-8p mandates:  responding appropriately to supervision and work situations.  (Opening Br. 12, ECF No. 17.)  However, as the cases cited above make clear, the ALJ may limit his function-by-function analysis to those "work-related mental activities relevant to the case at hand."  *E.g.*, *Catlin*, 2014 WL 2922403, at *3.  The ALJ did not find Ms. Hawker limited in her ability to respond appropriately to supervision and work situations.  Ms. Hawker does not argue she has limitations in that area.  Similarly, Ms. Hawker never alleges she has difficulty with extreme cold, vibration, or work hazards.  When the claimant does not claim limitations in a particular functional area, that area necessarily will not limit the claimant's RFC and thus has no relevance.  Because that function did not qualify as relevant, the undersigned RECOMMENDS the Court find the ALJ did not err by not discussing that function.  With respect to the issue of limiting torque motions, none of the occupations identified by the VE includes the need for torque, thus any failure to include that condition in the RFC did not impact the case outcome.  Because this Court finds any error harmless, it RECOMMENDS the District Court find harmless error as to these issues.

## E. Vocational Expert Testimony

Ms. Hawker argues the ALJ erred by relying upon vocational expert testimony in conflict with the DOT and RFC.  (Opening Br. 13–14, ECF No. 17.)   The ALJ's RFC included the following limitations:  "Language:  2" and "[w]ork at more than a low stress level, which means . . . working with the general public only occasionally."  (Tr. 28.)  Ms. Hawker argues the jobs

the vocational expert testified Ms. Hawker could perform—surveillance systems monitor (DOT 379.367-010), call-out operator (DOT 237.367-014), and election clerk (DOT 205.367-030)—conflict with her RFC.  Specifically, she points to the DOT's classification of surveillance systems monitor and call-our operator as requiring Language:  Level 3, *see* DOT 379.367-010, 1991 WL 673244; DOT 237.367-014, 1991 WL 672186, and the DOT's description of election clerk, which includes public contact (e.g., "Requests identification of voters at polling place. Obtains signatures . . . answers questions concerning voting procedure"), *see* DOT 205.367-030, 1991 WL 671719.

SSR 00-4p discusses how ALJs should approach conflicts between vocational experts and the DOT.  SSR 00-4p states in pertinent part:

> Occupational evidence provided by a VE [vocational expert] or VS [vocational specialist] generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000).

After Ms. Hawker's counsel questioned the vocational expert, the ALJ inquired about the following two potential inconsistencies with the DOT:  a sit-stand option and whether the surveillance monitor job is a private or public sector job and any related change to the number of jobs available.  (Tr. 76–77.)  The vocational expert stated he added in over 50,000 jobs to the surveillance monitor position to account for positions in

the private sector.  (*See id.* at 77.)  The vocational expert identified his "experience as a

vocational rehabilitation counselor" as the basis for his departures from the DOT.  (*Id.*)

The ALJ accepted this basis and relied upon the vocational expert's testimony in finding

Ms. Hawker capable of performing other work that exists in significant numbers in the

national economy.  (*Id.* at 35.)

However, the ALJ's opinion describes the vocational expert's explanation of the

basis for his departure from the DOT as follows:

> his education and study of these jobs, and his years of experience in
> observing and placing clients in these or similar jobs, as they are actually
> performed in the national economy, revealed that such jobs do allow for
> the sit/stand option, as well as the other elements of the hypothetical, in
> the reduced numbers noted above.

(Tr. 35.)  The vocational expert's testimony does not support the bases cited by the ALJ.

The vocational expert gave only "experience as a vocation rehabilitation counselor" as

the basis for his departure from the DOT.  (Tr. 77.)  Putting aside the Decision's

inaccurate restatement of the vocational expert's explanation, a vocational expert's

experience suffices to resolve a conflict between the DOT and the vocational expert's

testimony.  *See Rogers v. Astrue*, 312 F. App'x 138, 141–42 (10th Cir. 2009) (finding

vocational expert's experience sufficient to resolve conflict with DOT).  Futhermore,

after the vocational expert identified his experience as the basis for divergence, the ALJ

gave Ms. Hawker's counsel the opportunity to probe further, and he did not.  (Tr. 77.)

The Hearing transcript shows the ALJ only questioned the vocational expert about

a sit-stand conflict and private/public sector surveillance jobs.  (Tr. 76–77.)  However,

the vocational expert's identification of surveillance systems monitor and call-out

operator as jobs Ms. Hawker could perform given the ALJ's RFC, which included a

Language: 2 limitation, conflicts with the DOT's identification of those jobs as including a Language: 3 requirement.  *Cf.* tr. 72 (identifying language level at two or less) *with* DOT 379.367-010, 1991 WL 673244; DOT 237.367-014, 1991 WL 672186 (identifying language levels of 3).  An unresolved conflict may constitute harmless error where the vocational expert identifies other unchallenged jobs the claimant can perform.  *See Anderson v. Colvin*, 514 F. App'x 756, 764 (10th Cir. 2013) (finding ALJ's failure to resolve conflict between VE testimony and the DOT harmless where the ALJ found the claimant could perform "at least two" other jobs that existed in significant numbers).

Here, the ALJ found Ms. Hawker's RFC consistent with work as an election clerk.  (*See* tr. 35.)  However, as with the surveillance systems monitor and call-out operator jobs, the ALJ never resolved the apparent conflict between Ms. Hawker's RFC, which limited her to "working with the general public only occasionally," and the election clerk position, which requires contact with the public.  *See* tr. 28; DOT 205.397-030, 1991 WL 671719.  The DOT states an election clerk

> [p]erforms any combination of the following duties during elections:  Compiles and verifies voter lists from official registration records.  Requests identification of voters at polling place.  Obtains signatures and records names of voters to prevent voting of unauthorized persons. Distributes ballots to voters and answers questions concerning voting procedure.  Counts valid ballots and prepares official reports of election results.

*Id.*  The DOT description of the election clerk job includes contact with the general public.  *See Harris v. Astrue*, 2:11-CV-00194-BD, 2012 WL 5036009, *3 (E.D. Ark. Oct. 17, 2012) (noting election clerk job "requires contact with the general public").  Whether that contact occurs more than occasionally remains unclear from the record.  Because DOT conflicts may exist as to all of the positions the vocational expert identified, a conflict in one position does not become harmless by reference to another, as in *Anderson*.  Because the ALJ failed to elicit a reasonable

explanation for the conflict with the DOT on these issues before relying on the vocational

expert's testimony, substantial evidence does not support the ALJ's decision.  Therefore, the

undersigned RECOMMENDS remand to the ALJ to obtain clarification on these potential DOT

conflicts.

### F. VE Figures and Placement History

Ms. Hawker also argues the vocational expert's testimony cannot constitute substantial

evidence because his figures were out dated, and he had not placed any individuals in election

clerk or security systems monitor jobs recently.  (Opening Br. 14–15, ECF No. 17.)  Ms. Hawker

argues that the vocational expert's figures—updated less than two years before the hearing (*see*

tr. 74)—could not provide a basis for the vocational expert's testimony because of the economic

downturn occurring during that period.  (Opening Br. 14, ECF No. 17.)  However, Ms. Hawker

does not provide any authority requiring vocational experts to have placed a certain number of

persons in the jobs they discuss within a certain time period of the hearing.  Given the vast

number of jobs listed in the DOT, such an expectation appears unrealistic.  Furthermore, Ms.

Hawker's counsel expressly stated at the hearing that he had no objections to Mr. Cowart

testifying as a VE.  (Tr. 69.)  Therefore, Plaintiff waived any objection to the VE's

qualifications.  *See Hando v. Shalala,* 13 F.3d 405, No. 93-8039, 1993 WL 523213, at *4 (10th

Cir. Dec. 15, 1993) (finding that failure to object to VE's qualifications waives the objection).

Additionally, the ALJ had knowledge of these factors in considering the VE's testimony.  These

factors do not prohibit reliance on the VE's testimony as a matter of law.  Thus, the undersigned

RECCOMENDS denying the request to overturn the ALJ's decision on this point.

### G. The ALJ Decision's Description of the Evidence

Ms. Hawker argues substantial evidence does not support the ALJ's Decision because the Decision does not accurately describe the evidence.  (Opening Br. 15, ECF No. 17.)  Ms. Hawker essentially takes issue with the evidence the ALJ included or excluded from the Decision.

An ALJ need not discuss every bit of evidence in the record.  In *Clifton v. Chater* the Tenth Circuit described the ALJ's obligation:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

79 F.3d 1007, 1009–10 (10th Cir. 1996) (internal citations omitted).  Thus, an ALJ decision need not discuss every bit of evidence in the record, so long as the analysis provides enough substance for judicial review.  *See Stanwix v. Barnhart*, No. 02-4120-SAC, 2004 WL 303590, at *4 (D. Kan. Jan. 8, 2004) (affirming ALJ decision that did not specifically reference psychiatrist's opinion and noting ALJ's analysis must only "provid[e] significant substance for . . . review"); *Clifton*, 79 F.3d at 1009–10.  (explaining the ALJ must articulate the evidence considered sufficiently to allow the reviewing court to determine whether substantial evidence exists and whether the ALJ followed the law).

Ms. Hawker appears to ask the Court to reweigh the evidence to her favor.  But the Court "may neither reweigh the evidence nor substitute [its] judgment for that of the Commissioner." *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000).  First, Ms. Hawker raises concern that the ALJ did not mention the mild AC degenerative joint disease in her left shoulder.  (Opening Br. 15, ECF No. 17.)  However, the ALJ acknowledged significant limitations in Ms. Hawker's lifting abilities through his RFC finding (tr. 27-28), which allows the Court to review the matter.

Ms. Hawker recognizes the ALJ explicitly discussed the August 2009 CE and Dr. MacDonald's records (Opening Br. 15, ECF No. 17), and she does not indicate how the details she identifies would impact the ALJ's decision in her favor.  Without more, the undersigned RECOMMENDS the Court deny remand on this basis.

### H. Opinion Evidence – Physicians

Ms. Hawker argues the ALJ erred by failing to accord appropriate weight to medical opinion evidence, including the treating physician's opinion.  (Opening Br. 16–18, ECF No. 17.)  Specifically, Ms. Hawker contends Dr. Tschetter's status as her treating physician entitled his opinion to controlling weight.

An ALJ must evaluate every medical opinion.  20 C.F.R. §§ 404.1527(c), 416.927(c).  If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors.  20 C.F.R. §§ 404.1527(c) and 416.927(c) provide these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*See Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (citation omitted).  To reject a medical opinion, the ALJ must provide "'specific, legitimate reasons.'"  *Drapeau v. Massanari*,

255 F.3d 1211, 1213 (10th Cir. 2001) (quoting *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)).

Yet the ALJ's decision need not discuss explicitly all of the factors for each of the medical opinions. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review). When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) (reflecting the ALJ's duty to resolve conflicting medical evidence).

Here, the ALJ did not accord controlling weight to Ms. Hawker's treating medical provider's opinion. Instead, the ALJ's decision provided specific, legitimate reasons for granting "little weight" to Dr. Tschetter's opinion. (Tr. 32.) The ALJ wrote that Dr. Tschetter's opinion lacked support from relevant evidence, noting, for example, that "[i]f [Ms. Hawker] were really completely incapable of using her hands and fingers for work tasks, it would have been clearly noted somewhere else in the record." (Tr. 32.) The ALJ also noted "the lack of corroborating evidence for the extreme opinions" Dr. Tschetter offered. (*Id.*)

The ALJ accorded only moderate weight to Dr. Ottowicz's opinion (consultative physician). In support of that weight, the ALJ noted Dr. Ottowicz's opinion aligned with his examination of Ms. Hawker. (Tr. 33.) The ALJ also noted that compared to other medical source evidence, Dr. Ottowicz took a "less sympathetic" view of Ms. Hawker, but that view comported with Ms. Hawker's self reports. (*Id.*) The ALJ accorded Dr. Fyans's opinion great weight. (*Id.*) The ALJ noted Dr. Fyans's examination of Ms. Hawker supported his opinions and agreed with other medical evidence in the record. (*Id.*) Although the ALJ could have

provided more detail regarding the weight accorded Dr. Ottowicz and Dr. Fyans's opinions, the ALJ need not discuss each factor.  *See Oldham*, 509 F.3d at 1258.

Furthermore, the ALJ gave the state agency physician opinions great weight.  (Tr. 33.) The ALJ noted that as non-treating physicians, the state agency physician's opinions could not command controlling weight.  (*Id.*)  The ALJ also noted the state agency physician's experience and knowledge regarding social security disability requirements.  (*Id.*)  The ALJ found these opinions well supported by the medical record and consistent with the medical evidence.  (*Id.*)

Because the ALJ provided specific, legitimate reasons for the weights accorded to the various medical source opinions, supported by substantial record evidence, the undersigned RECOMMENDS the District Court find no error.

### I. The ALJ Did Not Err by Not Re-contacting the Treating Provider

Ms. Hawker argues 20 C.F.R. § 404.1512(e) required the ALJ to recontact the treating provider to seek additional evidence or clarification.  (Opening Br. 18, ECF No. 17.)  As a preliminary matter, 20 C.F.R. §404.1512(e) does not require the ALJ to recontact a treating physician.  Morever, anytime the ALJ does not completely adopt a treating physician's opinion, to the extent, 20 C.F.R §404.1512(e) addresses the point, it says the SSA will make "every reasonable effort to obtain evidence from your own medical sources."  During the ALJ's hearing, Ms. Hawker had no objection to the records admitted and had fourteen days from the hearing to supplement the record.  (Tr. 44.)  Ms. Hawker did supplement the record.  (Tr. 545-46.)  Thus, no objection can stand based on incompleteness of the medical record.

Furthermore, Ms. Hawker does not identify a specific treating provider in her opening brief and does not explain the purported inadequacy.  "The court is not required to consider poorly developed arguments."  *Cross*, 2013 WL 5402056, at *2; *see also Anderson*, 2013 WL

3216140, at *3 n.3 (declining to consider inadequately briefed and undeveloped arguments).  In her reply, Ms. Hawker identifies Dr. Tschetter as the physician at issue and states that the ALJ and the Government both set forth the problems with Dr. Tschetter's opinion that required the ALJ to recontact him.  (Reply 7, ECF No. 22.)  20 C.F.R §404.1520b(c) gives the ALJ discretion on "the way best to resolve the inconsistency or insufficiency."  Thus, on this decision and in light of Ms. Hawker's undeveloped argument, the Court can only RECOMMEND the District Court not remand on this point.

### J. Credibility & Pain Analysis (and Efforts to Obtain Pain Relief)

Ms. Hawker argues the ALJ did not properly evaluate her credibility and claims of pain. (Opening Br. 19, ECF No. 17.)  The Court disagrees.

 "'Credibility determinations are peculiarly the province of the finder of fact, and [a court] will not upset such determinations when supported by substantial evidence.'"  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990)).  "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *Id.* (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)).  If objective medical evidence shows a medical impairment that produces pain, the ALJ must consider the claimant's assertions of severe pain and decide the extent to which the ALJ believes the claimant's assertions.  *Id.*  To do this, the ALJ should consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

-28-

*Id.* (citation and internal quotation marks omitted).  But this analysis "does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

The ALJ found one could reasonably expect Ms. Hawker's medically determinable impairments to cause her alleged symptoms.  (Tr. 30.)  However, the ALJ found Ms. Hawker's statements about the intensity, persistence, and limiting effects of her symptoms lacked credibility.  (*Id.* at 30–31.)  The ALJ provided reasons for this finding.  (*See id.* at 31.)  For example, the ALJ noted that despite her "chronic symptoms related to cervical degenerative disc disease and some associated radiculopathy in her upper extremities" Ms. Hawker performed "a wide range of daily activities."  (*Id.*)  As discussed in the Decision, these activities include:  daily housework, including "dishes, laundry, or light cleaning"; reading and using a computer for about two hours total each day; and driving to the store without assistance once a week.  (*Id.* at 28–29.)

The ALJ also noted the inconsistency between Ms. Hawker's statements of pain and the medical evidence.  Dr. Ottowicz's report, which the ALJ's Decision specifically referenced as Exhibit 7F/1-5, (tr. 31), notes many such inconsistencies.  (Tr. 365–69.)  For example, although Ms. Hawker claims moving her neck caused discomfort and pain, Dr. Ottowicz observed she had no complaints from turning her neck while talking with him.  (Tr. 368.)  Nor did she complain when climbing on or off of the examination table.  (*Id.*)  He also noted inconsistent effort when he asked her to squeeze his fingers and that her complaints during a pin-prick test "d[id] not follow anatomic distribution of nerve anatomy."  (*Id.*)

Ms. Hawker also argues the ALJ erred by not considering her efforts to obtain pain relief in evaluating her credibility.  (Opening Br. 21, ECF No. 17.)  A claimant's attempts obtain pain relief represents one factor of many an ALJ may consider in evaluating a claimant's credibility.  *Kepler*, 68 F.3d at 391 (citation omitted).  The ALJ need not perform "formalistic factor-by-factor recitation of the evidence" but instead must only "set[] forth the specific evidence he relies on in evaluating the claimant's credibility."  *Qualls*, 206 F.3d at 1372.  As discussed above, the ALJ's Decision meets this standard.

For the reasons set forth above, the Court RECOMMENDS the District Court find substantial evidence supports the ALJ's evaluation of Ms. Hawker's credibility.

### K. SSR 96-6p Did Not Require an Updated Medical Expert Opinion

The ALJ makes the decision on medical equivalence.  SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996).  SSR 96-6p requires an ALJ to obtain an updated medical opinion "[w]hen additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."  *Id.* at *4.

Ms. Hawker argues that additional records from Dr. MacDonald (tr. 530–34) required the ALJ to obtain an updated medical opinion regarding medical equivalence.  (Opening Br. 20, ECF No. 17.)  The ALJ's Decision noted Dr. MacDonald's finding of a C6 radicular pattern (citing Ex. 27F) but no immediate neurological danger.  (Tr. 30.)  The ALJ also noted Dr. MacDonald's treatment recommendations "ranging from conservative care to aggressive surgical intervention." (*Id.*)  Dr. MacDonald's consultation notes show he considered a February 2010 MRI of Ms. Hawker's cervical spine that already appears in the record (tr. 432–33).  (Tr. 533.)  Ms. Hawker

has not shown anything in Dr. MacDonald's records that would have required the ALJ to order

an updated medical opinion.  For these reasons, the undersigned RECOMMENDS the District

Court not remand on this point.

### L. Opinion Evidence – Dr. MacDonald

Ms. Hawker argues the ALJ erred by not discussing the weight accorded Dr.

MacDonald's opinion.  (Opening Br. 20–21, ECF No. 17.)   20 C.F.R. § 404.1527(c) requires

evaluation of every medical opinion.  Here, the ALJ discussed Dr. MacDonald's examination of

Ms. Hawker, (tr. 30 (reference to Ex. 27F/3)), but failed to identify Dr. MacDonald by name,

articulate the weight, if any, given to Dr. MacDonald's opinion, or describe his evaluation of Dr.

MacDonald's opinion.  The Commissioner contends that the ALJ's consideration of Dr.

MacDonald's opinion suffices to meet requirements.  (Opp'n at 16.)  However, the Court

"cannot simply presume the ALJ applied the correct legal standards in considering [Dr.

MacDonald]'s opinion."  *See Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003); *see

also Degand v. Astrue*, No. 10-1387-JWL, 2011 WL 5837235, at *6 (D. Kan. Nov. 21, 2011)

(finding that where treating physician opinion is not entitled to controlling weight ALJ must

weigh all medical opinions, and "[i]n doing so she must explain the weight accorded to each

medical opinion, and the reasons for that weight").  The Court cannot meaningfully review the

ALJ's determination without the ALJ stating and explaining of the weight he accorded to Dr.

MacDonald's opinion.  The undersigned therefore RECOMMENDS the Court remand to the

ALJ for further findings as to Dr. MacDonald.

### M. The ALJ Should Have Ordered a Psychological Evaluation

Ms. Hawker argues the ALJ should have ordered a psychological examination to develop

further information regarding Ms. Hawker's claims of PTSD and personality disorder.  (Opening

Br. 21, ECF No. 17.)  An ALJ may order a consultative examination "if such an examination is necessary or helpful to resolve the issue of impairment." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).  But first, "the claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists." *Id.*  "Isolated and unsupported comments by the claimant are insufficient, by themselves, to raise the suspicion of the existence of a nonexertional impairment." *Id.* (citation omitted).  Instead, "the starting place must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Id.* (citing *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)).  Put simply, "the ALJ should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability." *Id.* at 1169.

Ms. Hawker argues the documentation from Valley Mental Health (tr. 467-474) required the ALJ to further develop the record by ordering a consultative examination.  (Opening Br. 22, ECF No. 17.)  However, Ms. Hawker's counsel did not raise Ms. Hawker's PTSD or personality disorder as issues requiring additional exploration.  (*See* tr. 42–78.)  "[T]he ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." *Hawkins*, 113 F.3d at 1167. However, where the record evidence raises the suspicion of a non-exertional impairment, the ALJ *must* order a consultative exam.  *Id.* at 1167–68.  Here, the Valley Mental Health documents reflect a licensed clinical social worker's diagnosis of Ms. Hawker as having major depressive disorder, recurrent, moderate, PTSD; and a non-specified personality disorder.  (Tr. 467.)  While

that opinion does not provide conclusive proof of the matter, it does raise reasonable suspicion of a non-exertional impairment. Even though licensed clinical social workers do not qualify as "acceptable medical sources," the SSA deems their opinions "important" and meriting evaluation. SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006). Under that analysis, on this record, the Valley Mental Health record establishes a reasonable possibility of the existence of a disability. While the ALJ finds Ms. Hawker has an affective/mood disorder, (tr. 25), he lacks any type of evaluation that would enable him to assess the impact of that disorder or the other possible mental health issues on Ms. Hawker's RFC. A consultative exam would materially assist the ALJ in determining the existence and any impact of the alleged disability. For these reasons, the undersigned RECOMMENDS the Court remand for a consultative exam on this issue.

## IV. RECOMMENDATION

For the reasons set forth above, the undersigned RECOMMENDS the District Court REMAND the Commissioner's decision.

The Court will send copies of this Report and Recommendation to all parties, who are hereby notified of their right to object. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The parties must file any objection to this Report and Recommendation within fourteen (14) days of service thereof. *Id.* Failure to object may constitute waiver of objections upon subsequent review.

DATED this 4th day of February, 2015.

BY THE COURT:

Evelyn J. Furse
United States Magistrate Judge

-33-